In the Matter of the Accounting of HENRY R. C. WATSON, as Surviving Executor and Trustee under the Will of WILLIAM WATSON, Deceased, Appellant.

ELIZABETH T. WATSON et al., as Executors of WILLIAM WATSON, Deceased, Respondents.

Will — provisions for trust — advancements — when interest properly charged against sums advanced to beneficiaries, who were also trustees of the estate.

Testator, who left him surviving four sons and five daughters, appointed all four sons executors and trustees and gave his residuary estate to them, in trust, to sell and convert into money, which was to be divided into as many equal shares as there were children surviving. The shares of the daughters were to be held in trust and the income thereof paid to them during their respective lives. The sons' shares were also to be held in trust, but one-half of the fund for each was to be paid him when he attained the age of twenty-five years, the remainder to be held in trust during their respective lives. At testator's death three of the sons, who were twenty-five years of age, were each paid one-half of the principal of his share as

12

nearly as the value thereof could then be estimated. Part of the land being of great prospective value had not been sold and under the authority vested in them by the will the trustees were holding it until that value could be realized. In order to equalize the income and prevent injustice to any of the legatees by an erroneous estimate of the value of the shares, the sons were charged interest on the sums advanced to them, which was added to the other income earned by the estate and divided equally between the nine legatees. On four separate accountings, the accounts of the trustees were legally approved, on some of them under objection as to the charge of interest by the representatives of the estate of one of the sons and trustees, who had died, and they continued to charge interest on the advances to themselves. The present accounting is the fifth and covers the period since 1908. The land held by the trustees has now been sold with an increase of the estate in a large amount. The representatives of the deceased son and trustee have again objected to the charge of interest on the advances made to such trustee. The objection was sustained and the decree affirmed by the Appellate Division. *Held*, error; that the objection should have been overruled and the account approved; that interest on the advances for the common use of the nine shares was an appropriate method of adjusting the inequality that would otherwise have resulted from the exercise by the trustees of their trust powers for their private benefit; that the charge in controversy does not depend for its validity either upon contract or upon any legal default; and that it is a recognition of the equitable obligation of trustees when distributing a trust estate for their own benefit so to deal with it as to do equal justice to all the beneficiaries.

*Matter of Watson*, 163 App. Div. 656, reversed.

(Argued November 11, 1914; decided December 1, 1914.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered July 31, 1914, which affirmed so much of a decree of the Westchester County Surrogate's Court as sustained an objection to the accounts of Henry R. C. Watson, as surviving executor and trustee under the will of William Watson, deceased.

The facts, so far as material, are stated in the opinion

*James J. Allen* for appellant. The decree dated July 14, 1913, rendered on the third accounting was *res adjudi-*

*cata* that at the date thereof William had received in excess of his realized share about $36,000; that such excess was in the nature of an " advance " and not a payment to which he was absolutely entitled, and the decree is conclusive as to the right and the duty of the trustees to charge interest on such part of the excess of such advances over his realized share as might still remain unliquidated during the present accounting period. (*Legendre* v. *Scottish Ins. Co.*, 183 N. Y. 392; *House* v. *Lockwood*, 137 N. Y. 259; *Matter of Willetts*, 112 N. Y. 289; *Matter of Garth*, 10 App. Div. 100; *Kager* v. *Brenneman*, 47 App. Div. 63; 165 N. Y. 674; *Bowditch* v. *Ayrault*, 138 N. Y. 222; *Matter of Hoyt*, 160 N. Y. 607; *Rudd* v. *Cornell*, 171 N. Y. 114.)

*Edward W. Davidson* for respondents. The payments of $130,000 to each of the sons of testator were payments on account of their shares of the estate, to which they were absolutely entitled, and were not loans to them by the trustees. (*Matter of Trustees, etc.*, 137 App. Div. 98; *House* v. *Lockwood*, 137 N. Y. 259.) The decree upon the third accounting did not adjudicate the nature of the payments, nor is it in any way binding or conclusive upon the question now before this court. (*Rudd* v. *Cornell*, 171 N. Y. 114; *Matter of Hunt*, 160 N. Y. 618; *Bowditch* v. *Ayrault*, 138 N. Y. 222; *Matter of Hamin*, 142 App. Div. 442; *Kirk* v. *McCann*, 117 App. Div. 59; *Matter of Elting*, 93 App. Div. 516; Code Civ. Pro. § 2742; *Chase* v. *Ewing*, 51 Barb. 597.)

CARDOZO, J.   William Watson, the elder, died in 1877, leaving a will and codicil. He was survived by nine children, four sons and five daughters. All four sons were appointed executors and trustees. They were directed by the will to sell and convert into money the entire residuary estate. The proceeds were to be divided into as many equal shares as there were children surviving. The

daughters' shares were to be held in trust for their respective lives. The sons' shares were also to be held in trust, but one-half of the principal was to be paid to them as they reached the age of twenty-five years, and the other half as they reached the age of thirty-five years. Advances of principal might be made to them before those times in the discretion of the executors if it seemed desirable to assist them in business, but not in excess of one-half of the amount to which they would probably or possibly be entitled. By a codicil the provision for the sons was modified by annulling the direction that the residue of their shares should be paid at the age of thirty-five, and by substituting a direction that the trusts in respect of that portion should continue during their several lives. The will states that the trustees, though required to sell the real estate, may defer the sale in their discretion during the life of the testator's wife, and advises, without, however, controlling the judgment of the trustees, that the sale be deferred to that extent in order that an increase of value may be gained.

At the time of their father's death, three of the four sons, William, the younger, Robert and Francis, had already arrived at the age of twenty-five. Each of them was, therefore, entitled to receive one-half of one-ninth of the residuary estate as soon as it was converted into money. The character of the estate made it inexpedient, however, that there should be a speedy sale of the land. Included in the land was a farm of two hundred and forty acres in a district then part of the town of Westchester and now part of the city of New York. It was believed, and rightly as the sequel proved, that the farm, if retained, would yield a large increase of value. To hold back the land from sale meant, of course, that the value of the sons' shares of the proceeds could not be determined at that time with certainty. It meant too that if the value was to be estimated as best it might, the payments, if presently made, must come out of the personal estate.

That part of the estate had a value, according to the inventory, of $731,751.27. To pay the sons out of this fund carried with it, however, a risk of injustice toward the daughters, and that in two ways. In the first place, there was the chance that the value of the shares, if determined in advance of a conversion of the whole estate, would be overestimated, and there would thus be an overpayment of principal. In the second place, there was the certainty that the distribution of the personal property among the sons would give them the benefit of the bulk of the productive assets, and would leave the real estate, which was destined for many years to be largely unproductive, as the source of income for the daughters. The sons to whom the payments were due were also the trustees under the will, and in estimating the value of the estate and selecting the property to be converted into money, they were exercising their trust powers in their own behalf. Appreciating this conflict between their interests and their duties, they determined to fulfill the obligations of good faith and honor by insuring an equal division of the income among the sons and daughters. Soon after the probate of the will they paid to each of three sons William, Robert and Francis $130,000 "as and for an estimated one-half of the one-ninth share of the testator's estate" devised and bequeathed to them. Later they paid to each an additional $28,000 as a result of the increase of the estimate. To equalize the income they then charged themselves with interest, first at the rate of four, and later at the rate of five per cent. on the amount of these advances. This income was added to the other income earned by the estate; and the entire fund was then divided into nine equal parts. In that way sons and daughters retained the benefit of the land with its great prospective value, but the burden of carrying it during years of drought was ratably distributed.

The trustees had their first accounting in 1886. They

showed the payments of principal which they had made to themselves, and also the charges which they had made against themselves to equalize the income. By that time, the fourth son, Henry, had reached the age of twenty-five; and the decree directed that a like payment of principal be made to him, "it being understood that the said sum * * * is an estimated amount and is subject to correction and alteration when said executors and trustees shall have realized on the whole of the estate of the testator both real and personal." The trustees' accounts were approved; and they continued to charge themselves with interest on the amount of the advances.

In the year 1887 William Watson, Jr., died. During his life he had made no protest against the charge of interest which had been made against him as against his brothers. On the contrary, as one of the trustees, he had made the charge himself. He had recognized his obligation as a fiduciary to the other beneficiaries, and had been prompt to fulfill it. Objection came for the first time after his death and from those who succeeded to his share of the estate. There was a second accounting in 1898. The interest charges to equalize income were again approved. There was a third accounting in 1902. On this occasion the representatives of William Watson, Jr., objected to the charge of interest on his share; but by a decree made in 1904 the objection was overruled and the account approved. A fourth account, filed in 1908, was followed by a like objection and a like decree. The present accounting is the fifth, and covers the period since 1908. The farm has now been sold, with an increase of the estate to the extent of nearly a million dollars. Up to the date of the final conversion of the estate into money, interest, to equalize the income, has been charged on the advances as in previous years. Again the representatives of William Watson, Jr., have objected to the charge. On this occasion, however, the surrogate has refused to follow the precedent established by the earlier decrees.

1914.] Opinion, per CARDOZO, J. · [213 N. Y.]

The objection has been sustained, and the ruling has been approved at the Appellate Division. On an appeal taken by the sole surviving trustee the case comes to this court.

We think that the attempt at this late day to nullify the apportionment of income to which William Watson, Jr., assented in his life, is not entitled to prevail. It is true that on reaching the age of twenty-five he had the right to receive a moiety of one-ninth of the estate, but only after the estate had been converted into money. Until that time no one could say with certainty what the value of a ninth would be. He was himself one of the trustees. His brothers, who were entitled to similar payments, were also trustees. They did not limit themselves to an eighteenth part of so much of the estate as had then been converted. They took out of the personal estate an estimated eighteenth part of the entire estate. In doing this they did not elect to forego their interest in the land. They proposed to retain the advantage that would result from its future increase in value. They, or their successors in interest, have profited by that increase, and their shares of the principal, as appears by this decree, have been correspondingly increased. They could not so apportion the estate as to gain for themselves, through the postponement of a sale, the benefit of increased principal, and cast upon the other beneficiaries in the interval the entire burden of diminished income. They had a discretion as to the time of sale, but they could not appropriate to themselves all the gains that would have resulted from an immediate sale without relinquishing the profits resulting from its postponement. They were acting as trustees in a transaction that concerned them as individuals; and fundamental principles of equity forbade an administration of the trust by which an unfair profit would result to themselves to the detriment of others for whom the trust had been created. (*Mitchell* v. *Reed,* 61 N. Y. 123, 134.) The payment of interest on the advances for the common use of the nine shares was an appropriate

method of adjusting the inequality that would otherwise have resulted from the exercise by the trustees of their trust powers for their private benefit. A similar rule has been adopted by the courts of England in giving effect to the hotchpot clause which is common in English wills. (*Willoughby* v. *Decies*, L. R. [1911] 2 Ch. 581, 600; *Matter of Rees*, L. R. [17 Ch. D.] 701.) "Hotchpot implies equality. The equality contemplated is equality at the period of distribution. Although the testator has said nothing about interest upon advances, equality is to be achieved by charging interest from the period of distribution to the date of distribution." (*Willoughby* v. *Decies*, *supra*.) The charge of interest in such cases, as was said by Sir GEORGE JESSEL in *Matter of Rees* (*supra*), is merely an expedient which the courts have adopted to achieve equality. In this case the duty to achieve equality arose when distribution among the sons was made in advance of the conversion of the whole estate; it was emphasized by the fact that as trustees they were making distribution among themselves; and it was fittingly discharged through the award of interest. It would be unfortunate if this recognition of an obligation, sanctioned alike by considerations of honor and of established principles of equity, were now to be frustrated.

It is not an answer to say that the decree made in the accounting of 1886 confirmed the payments which the trustees had made to themselves and thereby adjudged that the payments involved no breach of duty. It confirmed at the same time the charges which the trustees had made against themselves for interest, and thus by implication adjudged that the payments and the charges must be sustained together. It is also not an answer to say that there was here no contract or default that would sustain a recovery of interest at law. (*Matter of Trustees of N. Y. & Brooklyn Bridge*, 137 N. Y. 95.) There are cases when interest is not recoverable at law, and is yet allowed by courts of equity. (*Woerz* v. *Schu-*

*macher*, 161 N. Y. 530, 538.)   The charge in controversy
does not depend for its validity either upon contract or
upon any legal default.   It is·a recognition of the equi-
table obligation of trustees, when distributing a trust
estate for their own benefit, so to deal with it as to do
equal justice to all the beneficiaries.

The order should be reversed, with costs in both courts,
and the matter remitted to the Surrogate's Court of
Westchester county for further proceedings not incon-
sistent with this opinion.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE, COLLIN,
HOGAN and MILLER, JJ., concur.

Order reversed, etc.